**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

**JOSEPH LIPOVSKY**                                                              **PLAINTIFF**

**V.**                                                              **NO. 4:14-CV-00047-DMB-JMV**

**THOMAS VILSACK, SECRETARY,**
**UNITED STATES DEPARTMENT OF**
**AGRICULTURE**                                                              **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

This employment discrimination action is brought by Joseph Lipovsky against his current employer, the United States Department of Agriculture ("Department" or "USDA"). Doc. #119. Lipovsky alleges that the Department violated Title VII of the Civil Rights Act by engaging in unlawful harassment and retaliation on the basis of his prior statutorily protected activities of filing and settling a Title VII action, and filing and pursuing administrative complaints. Before the Court is the Department's motion to dismiss or, in the alternative, for summary judgment. Doc. #121. Because the Court finds that it lacks jurisdiction over Lipovsky's claims based on failure to promote, failure to audit his position, and failure to convene a five-person review committee, the motion will be denied in part and such claims transferred to the United States Court of Federal Claims. As for Lipovsky's remaining claims of retaliation, the motion will be granted due to Lipovsky's failure to demonstrate the necessary elements to prove retaliation.

# I
## Applicable Standards

The Department seeks dismissal pursuant to Rule 12(b)(1), and dismissal pursuant to Rule 12(b)(6) or, alternatively, summary judgment pursuant to Rule 56. Doc. #121.

## A. 12(b)(1) Motion

When "a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 347 (5th Cir. 2014). "In evaluating subject matter jurisdiction on a motion to dismiss a court may consider (1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Tewari De-Ox Sys., Inc. v. Mountain States/Rosen Liab. Corp.*, 757 F.3d 481, 483 (5th Cir. 2014) (internal quotation marks omitted).

## B. 12(b)(6) Motion and Motion for Summary Judgment

In the event the Court determines it has subject matter jurisdiction and proceeds to consider the 12(b)(6) motion, it must decide whether to treat it as a motion for summary judgment. *McNair v. Mississippi*, 43 F.Supp.3d 679, 682 (N.D. Miss. 2014) (citing Fed. R. Civ. P. 12(d)). As a general matter, where a defendant files a 12(b)(6) motion and "submit[s] matters outside the pleadings without such evidence being excluded by the Court [within ten days]," the proper course is to treat the 12(b)(6) motion as a motion for summary judgment. *Id.* (citing *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1284 (5th Cir. 1990)).

Here, the Department submitted matters outside the pleadings and more than ten days have since passed without such evidence being excluded by this Court. Under these circumstances, the Court will treat the Department's 12(b)(6) motion as a motion for summary judgment. *McNair*, 43 F.Supp.3d at 682.

Under Rule 56 of the Federal Rules of Civil Procedure, "[s]ummary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship,* 520 F.3d 409, 411 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 22–23 (1986)). To award summary judgment, "[a] court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Id.* at 411–12 (internal quotation marks and citation omitted). To this end, "[t]he moving party bears the burden of establishing that there are no genuine issues of material fact." *Id.* at 412.

"If … the nonmoving party bears the burden of proof at trial, the moving party may demonstrate that it is entitled to summary judgment by submitting affidavits or other similar evidence negating the nonmoving party's claim, or by pointing out to the district court the absence of evidence necessary to support the nonmoving party's case." *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998) (citation omitted). If the moving party makes the necessary demonstration, "the burden shifts to the nonmoving party to show that summary judgment is inappropriate." *Id.* In making this showing, "the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Cotroneo v. Shaw Env't & Infrastructure, Inc.,* 639 F.3d 186, 191–92 (5th Cir. 2011) (citation and internal punctuation omitted). When considering a motion for summary judgment, the Court "resolve[s] factual controversies in favor of the nonmoving party." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).

## II
## Relevant Facts

### A. Parties

On September 10, 1990, Lipovsky began working with the Department. Doc. #126-3 at ¶ 1. During the time period relevant to this suit, Lipovsky was employed with the Office of Technology Transfer ("OTT") in the Department's Agricultural Research Service ("ARS"). *See generally* Doc. #121-1 at 8; Doc. #121-9. The stated mission of the ARS is to "[c]onduct research to develop [and] transfer solutions to agricultural problems of high national priority and provide information access and dissemination."[1] The OTT operates the ARS Technology Transfer Program, which facilitates the transfer element of the ARS' mission. The OTT, in turn, is separated into area offices. The area offices serve as the first point of contact for scientists and companies, and are responsible for the negotiation and implementation of research and transfer agreements.

The position of Technology Transfer Coordinator ("TTC"), the job relevant to this action, has three primary duties: (1) negotiating Cooperative Research and Development Agreements ("CRADA"); (2) negotiating confidentiality agreements; and (3) negotiating Material Transfer Agreements ("MTA").[2] Doc. #121-19 at 12.

### B. Initial Lawsuit and Settlement

As of August 2000, since his work with the Department began, Lipovsky had performed three jobs for the Department: "Acting TTC, GS-15 position; a Patent Advisor, GS-14 position;

---

[1] The Court takes judicial notice of the mission and structure of the ARS, as stated on its website. *See Gustavson v. Wrigley Sales Co.*, 961 F.Supp.2d 1100, 1113 n.1 (N.D. Cal. 2013) ("The Court may take judicial notice of materials available on government agency websites.") (collecting cases); *see Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (taking judicial notice of factual information on state website).

[2] The position also carries a secondary duty to "help out the headquarters" for the OTT. Doc. #121-19 at 16.

and Licensing Specialist, a GS-11 to GS-14 position." Doc. #126-3 at ¶ 22. On August 17, 2000, Lipovsky suffered a stroke. *Id*. at ¶ 3. The following year, he underwent a heart transplant. *Id*. In 2004, Lipovsky was demoted to a GS-11 Patent Advisor/Foreign Document Prosecution Specialist. *Id*.

In 2005, Lipovsky filed a civil suit in the United States District Court for the Central District of Illinois[3] alleging that the Department engaged in unlawful employment discrimination when it downgraded him from a GS-14 Patent Advisor position to a GS-11 Patent Advisor/Foreign Document Prosecution Specialist. *See Lipovsky v. Johanns*, 1:05-cv-1304 (C.D. Ill. Oct. 11, 2005) ("*Lipovsky I*"), at Doc. #1, at ¶ 6. Although Lipovsky's complaint purported to arise from the Americans with Disabilities Act and Title VII, it asserted only a single count – a claim for discrimination under the ADA that "plaintiff was demoted in violation of the ADA due to his alleged inability to perform the excessive workload given him." *Id*. at Doc. #1, at ¶¶ 4, 18.

On March 17, 2006, Lipovsky filed an amended complaint "for discriminatory conduct in violation of the Rehabilitation Act of 1973 and 42 U.S.C. § 2000(e) ("Title VII")." *Id*. at Doc. #18, at ¶ 1. Lipovsky's amended complaint alleged that "plaintiff was demoted in violation of the [Rehabilitation] Act due to his alleged inability to perform the excessive workload given him." *Id*. at Doc. #18, at ¶ 18.

On June 26, 2008, the Department moved for summary judgment on Lipovsky's Rehabilitation Act claim. *Id*. at Doc. #40. Approximately six weeks later, United States Magistrate Judge John A. Gorman denied the summary judgment motion. *Id*. at Doc. #49.

---

[3] Although the evidentiary record is less than clear, Lipovsky's 2008 performance review lists Peoria, Illinois, as his duty station. *See* Doc. #121-1 at Ex. 17 at 207. The Court assumes Lipovsky's previous employment occurred in Peoria.

On November 14, 2008, the Department and Lipovsky executed a settlement agreement under which Lipovsky agreed to "waive all claims whether known or unknown against the USDA, its agents, servants or employees that relate to any and all allegations of discrimination which occurred prior to the entry of the Order dismissing this case." *Id*. at Doc. #70, at ¶ 3. In return, the Department agreed to pay Lipovsky $350,000 and to "provide the plaintiff with an Associate Technology Transfer Coordinator ("ATTC") position located in New Orleans, Louisiana." *Id*. at Doc. #70, at ¶¶ 4–5.

Under the terms of the settlement, the parties agreed that the ATTC position:

shall be classified as a GS-14, Step 10 level. Further, the plaintiff may seek an audit of this position in approximately one year or when events warrant to determine if the duties engaged in by the plaintiff allow for a job re-classification. This audit shall be conducted in the usual manner. The parties shall agree between themselves on when the plaintiff is to commence acting in this position. Unless otherwise approved in writing by the parties, in no case shall the time for plaintiff to start at this position be later than 90 days from the entry of the Order dismissing this case. The plaintiff shall be physically located in New Orleans and the costs of relocation to New Orleans shall be borne by the plaintiff.

*Id*. at Doc. #70, at ¶ 5. Although not expressly stated in the settlement agreement, Lipovsky claims that, in October 2008, the Department, acting through Richard Brenner, then the Assistant Administrator for Technology Transfer, agreed that he would be evaluated by a five-person team. Doc. #121-13 at Ex. 8, at 107; Doc. #121-12 at 3.

On November 14, 2008, commensurate with the terms of the Settlement Agreement, Judge Gorman entered an order dismissing the case. *Lipovsky I*, at Doc. #71. The stipulated order of dismissal provided: "The parties further agree that this Court shall retain jurisdiction to enforce the terms and conditions set forth in the Agreement for Compromise and Settlement and Release of Claims for a period of Fourteen (14) Months from the date that the plaintiff commences his GS-14, Step 10 position." *Id*.

## C. Reassignment and Changes in Duties

On January 5, 2009, following the settlement of his civil action, Lipovsky assumed the position of ATTC under TTC Don Nordlund in New Orleans, which is located in the ARS's Mid South Area. Doc. #126-3 at ¶¶ 5, 15. Lipovsky was the first USDA employee to hold the ATTC title.[4] Doc. #126-12 at 32.

As an ATTC, Lipovsky "negotiated CRADAS for cooperative agencies working with USDA and … historically signed the cover sheet of the CRADAS." Doc. #126-3 at ¶ 15. Lipovsky was also responsible for the negotiation and preparation of Material Transfer Agreements. *Id.* at ¶ 18.

## D. 2009 Reprimand and 2010 Review

On December 3, 2009, Nordlund issued Lipovsky a memorandum, stating:

> You have been in your current assignment for slightly over nine months. The end of that nine month period coincided with the end of the agency's normal annual performance ration period. In previous quarterly reviews, I identified some areas where improvement was necessary in order for you to be fully successful in performance elements. I remain concerned on some previously discussed issues. Accordingly, having had some discussion with line management and Employee Relations, your annual performance rating period will be extended through February 28, 2010. The intent is to provide you with every possible opportunity to achieve a fully successful performance rating.
>
> This places us in the position of having to conduct a third quarterly review of your performance and my current assessment of your performance is very similar to my previous assessments. You continue to demonstrate an inadequate understanding of the laws, regulations, and policies that govern technology transfer activities in ARS …. Further, I was particularly disappointed in the quality of the National FLC Excellence in Technology Transfer Award nomination packages you submitted ….

Doc. #121-20 at Ex. 7.

---

[4] Although there is some dispute on this point, it appears that sometime before 2011, a second ATTC, Chris Johnson, was hired under TTC Dave Nicholson. Doc. #126-12 at 32, 35, 40. The resolution of this factual dispute, however, is not necessary to dispose of the Department's motion.

On February 3, 2010, Nordlund, without consulting a five-person team, issued Lipovsky an untimely[5] performance review in which he found Lipovsky to be "fully successful." Doc. #121-13 at Ex. 8 at 100.

### E. Transfer to Supervision by Tommy Valco

On October 18, 2010, Lipovsky was informed that, from that date on, he would be supervised out of Stoneville, Mississippi, by TTC Tommy Valco, the new TTC for the Mid South Area.[6] Doc. #121-13 at Ex. 8, at 104; Doc. #121-14 at Ex. 9, at 169; Doc. #126-4 at Ex. 9, at 135. Nordlund, who had previously served as TTC for both the South Atlantic and Mid South Areas, remained as TTC for the South Atlantic Area. Doc. #121-14 at Ex. 9, at 172; Doc. #121-2 at Ex. 1, at 19. Sometime later, Lipovsky transferred to the Stoneville office. Doc. #126-14 at Ex. 7, at 124.

In 2011, Robert Griesbach, then Lipovsky's second line supervisor,[7] became aware that Lipovsky was doing "more detailed" work than the other ATTC, Chris Johnson. Doc. #126-12 at 35. As a result of this discovery, Griesbach and Valco, who was then Lipovsky's first line supervisor, gave Lipovsky a "superior" rating and a cash award. *Id.* at 66.

On March 7, 2011, Lipovsky began negotiations on a CRADA with PHARMAQ, a Norwegian company. Doc. #126-14 at Ex. 7, at 129. On February 27, 2012, Annetta Ebelhar, acting on behalf of Tom Moreland, informed Lipovsky that the PHARMAQ negotiations would

---

[5] Nordlund explained, "Under a normal rating cycle, [Lipovsky's] performance evaluation would have been due in October. [Lipovsky] assumed his position several months after the beginning of the rating period. [Lipovsky's] rating period was extended (per memo dated Dec. 3, 2009) through Feb. 28, 2010. No specific due date for his performance evaluation was given." Doc. #126-4 at Ex. 9, at 126.

[6] According to Nordlund, "it had been a long standing desire to have a Technology Transfer Coordinator in each of ARS' eight areas." Doc. #126-4 at Ex. 9, at 127. At some point in 2009, Lipovsky had requested a new supervisor. *Id.* at 135.

[7] After a 2012 reorganization which removed the ATTCs from OTT control, Ed King, the Area Director (also known as Center Director) became Lipovsky's second line supervisor. *See* Doc. #126-14 at Ex. 7, at 125.

be assigned to another employee. *Id.* at Ex. 7, at 129. "Just before" May 9, 2012, Valco told Lipovsky to resume the lead on the agreement. *Id.* On or about June 11, 2012, Valco informed Lipovsky that "Headquarters and National Program Staff" would take control of the negotiations. *Id.*; Doc. #121-14 at Ex. 9, at 171.

## F. Change in CRADA Authority

Sometime in 2011, Griesbach, then the Acting Assistant Administrator, became concerned that the cover sheets for the CRADAs were being improperly filled out. Doc. #126-3 at ¶ 21; Doc. #121-19 at 48–49. Specifically, Griesbach observed that the cover sheets had a space for TTC, not ATTCs, and that, insofar as Lipovsky was not a TTC, it was improper for him to sign the form.[8] Doc. #121-19 at 48. Griesbach sent an e-mail with this conclusion to Lipovsky and Nordlund. *Id.* at 48–49.

On November 28, 2011, Moreland informed Lipovsky that he could no longer sign the cover sheet of a CRADA as the individual who negotiated and developed the document. Doc. #126-3 at ¶ 14. Although Moreland declined Lipovsky's request to put the reason for this decision in writing, he testified that "the tech transfer coordinator is ultimately responsible for what happens in their area." Doc. #126-13 at 26.

## G. Norlund Retirement

In 2011, Don Nordlund retired from his role as TTC for the South Atlantic Area. Doc. #121-14 at Ex. 9, at 172. Around the same time, the TTC from the North Atlantic Area retired. Doc. #121-11 at Ex. 8, at 163. The Administration for the ARS decided "to cancel these TTC positions and not fill them." *Id.* Under this plan, "[a]ll of the other TTCs and TAAs were to

---

[8] At his deposition, Griesbach made clear there was nothing inherently wrong with Lipovsky signing a CRADA cover sheet. Doc. #121-19 at 50. Rather, the problem arose from Lipovsky signing those particular cover sheets, which each had a space for a TTC signature but not an ATTC signature. *Id.*

help out with the [South Atlantic Area] and [North Atlantic Area] tech transfer activities."[9]  *Id.* On an unspecified date, "[t]here was an announcement in an Office of Technology Transfer teleconference ... stat[ing] that anyone interested in the detail was to contact Robert Griesbach." Doc. #126-14 at Ex. 7, at 131.

On March 7, 2012, Lipovsky submitted a request to Valco to "be allowed to handle the South Atlantic Technology Transfer Coordinator position from Stoneville, MS and that I keep the existing oversight structure of Tommy Valco and Ed King."  Doc. #126-14 at Ex. 7, at 133. Lipovsky asked that the request be forwarded to Griesbach.  *Id.*  When Lipovsky made this request, Valco informed him that he had made the same request and "had been turned down."  *Id.* at 134.

After Nordlund's retirement, Griesbach and Tom Moreland, the Partnership Liaison at OTT, handled the technology transfer activities in the South Atlantic Area.  Doc. #121-14 at Ex. 9, at 172.  Sometime later, Griesbach approached Valco and asked "if his group could coordinate the tech transfer services for South Atlantic Area since they were physically the closest."  Doc. #121-11 at Ex. 8, at 163.  Valco told Griesbach that "we at the Mid South Area would be glad to help."  Doc. #121-14 at Ex. 9, at 172.  In March 2012, Valco was assigned the South Atlantic duties and "utilized [Lipovsky] to help with the duties."  *Id.*  Valco informed Lipovsky of the assignment on March 16, 2012.  Doc. #126-14 at Ex. 7, at 134.

### H.  Reprimands Related to Interactions with Patent Advisors

On April 6, 2012, Lipovsky sent an e-mail to Evelyn Rabin, the Patent Advisor for the Mid South Area, asking that she approve a particular case and have her staff notify Lipovsky

---

[9] At some point, the Mid South Area merged into the South Atlantic Area.  Doc. #121-19 at 27–28.

upon approval.[10]  Doc. #126-14 at Ex. 7 at 155.  On May 9, 2012, Griesbach, stating that he had

been asked to do so, responded on Rabin's behalf, suggesting that "the best time to get input was

from the Area Office when they sign off on it."  *Id*. at 154–55.  According to Lipovsky, this

practice had "not been the case for the Mid South Area."  *Id.* at 155.  Although Lipovsky

conceded that he was not barred from contacting other Patent Advisors or even from contacting

Rabin, he believed that "the scenario at hand require[d] interaction [with] Rabin."  *Id*. at 155.

Additionally, insofar as Lipovsky's performance plan included the topics of "interface with

Patenting and Licensing Program" and "Communications/Interpersonal Relations/Human

Resources Management," Lipovsky felt that Griesbach's action would adversely impact his

performance under the plan.  *Id*.

Relatedly, on May 9, June 26, and July 13 of 2012, Griesbach told Lipovsky to "stop

providing patenting advice to … scientists and to the Patent Advisors."  Doc. #121-11 at Ex. 8, at

165.  According to Griesbach, Lipovsky's role as an ATTC was "to interact with Patent

Advisor[s] but not advise.  [Lipovsky] was trying to do the work of a patent advisor which was

confusing the scientist."  *Id*.

### I.  Wrongful Work Instruction

At some point in 2012, Lipovsky was instructed by Nordlund, Moreland, and Griesbach

"to approve agreements for a period in excess of five (5) years," which Lipovsky believed to be

"in violation of the Technology Transfer Act of 1986, 15 U.S.C. § 3710(a)(c)(n)."  Doc. #126-3

at ¶ 21.  Specifically, Griesbach and Moreland told Lipovsky that he could approve agreements

in excess of five years.  Doc. #126-14 at Ex. 7, at 137.

---

[10] According to Lipovsky, advance notice of an approval "can make the difference between me having enough time
to prepare a case … or not."  Doc. #126-14 at Ex. 7, at 154.

## J. Block of Computer Access

On an unspecified date, Lipovsky found that he was unable to access "components of the OTT Technology Transfer Coordinators page of the OTT Home Page" on the Department's ARIS website.[11]  Doc. #126-14 at Ex. 7, at 156–57.  It is undisputed that the OTT page is "essential" for a TTC and that lack of access "could preclude [Lipovsky] from doing part of his job" as a TTC.  Doc. #121-11 at Ex. 8, at 166.

Regarding his lack of access, Lipovsky approached Griesbach and said that he "couldn't get some information."  Doc. #121-11 at Ex. 8, at 167.  Griesbach asked for specifics but Lipovsky never responded.  *Id.*  Griesbach denies blocking Lipovsky from the system and claims that he did not know which system Lipovsky was referring to until Lipovsky filed an EEO complaint.  *Id.* at 166–67.  Griesbach does "not believe that anyone purposely blocked him out." Rather, Griesbach speculates that "[t]here could have been some type of computer error when his computer was updated that restricted his access."  *Id.* at 166.

## K. Change in MTA Authority

At an unspecified time, Griesbach, while involved in a case in Texas, was asked who had authority to sign MTAs.  Doc. #121-19 at 60–61.  Griesbach later asked Moreland to speak with the Office of General Counsel ("OGC") to ascertain which employees had authority to sign the MTAs.  Doc. #126-13 at 40.  Griesbach told Moreland that he wanted an answer on authority because Lipovsky had expressed a desire to sign the agreements.  *Id.* at 41.  Moreland, in turn, spoke with Leslie Shaw of the OGC.  *Id.* at 40–41.  The OGC came to the conclusion that authority to sign the MTAs was delegated only to the Assistant Administrator and the Acting

---

[11] There is no indication in the record how long Lipovsky's lack of access lasted or which components of the page were blocked.

Assistant Administrator. Doc. #121-19 at 60–61. According to Griesbach, this "was the opinion of all our lawyers …." *Id*. at 59.

On April 1, 2013, Griesbach, in his role as Deputy Assistant Administrator, issued a delegation of authority to "Technology Transfer Coordinators" "to negotiate and approve Material Transfer Agreements and Confidentiality Agreements." Doc. #121-16. Other than the TTCs, Griesbach did not delegate authority to other OTT employees in the field because, due to an October 1, 2012, reorganization, "OTT employees in the field … were transferred from OTT to the Area Offices [and] OTT retained only the supervision of the Technology Transfer Coordinators." Doc. #121-18 at Ex. 8, at 6. Under this delegation, eight employees other than Lipovsky were barred from signing MTAs. *Id*. at 7. However, Lipovsky was the only impacted employee. *Id*.

On April 8, 2013, Moreland and Griesbach informed Lipovsky that he would "no longer be allowed to sign MTAs that [he] negotiated and completed based on the fact that they claimed there was no authority for [him] to sign such agreements." Doc. #126-3 at ¶ 18. Sometime later, Lipovsky was allowed to co-sign the MTAs with the TTC. Doc. #121-19 at 61–62; Doc. #121-18 at Ex. 8, at 7.

### L.  Relevant Administrative History

During his time as an ATTC, Lipovsky filed an array of administrative complaints.

#### 1.  ARS-2010-00411

On April 23, 2010, Lipovsky submitted a complaint of discrimination alleging "Reprisal for prior EEO activity":

> I have been subjected to harassment (non-sexual) and a hostile work environment in retaliation for prior EEO activity. Specifically the agency failed to comply with the terms of my out of court settlement completed in October 2008. They failed to promote me to a GS-15 Technology Transfer Coordinator for the Mid

> South Area, denied me the utilization of the services of Jason Bray for clerical support, and assigned me to a supervisor who failed to utilize my support team as had been agreed so for my performance appraisal, which was late and appeared to be a performance improvement plan. When, per the agreement, things did not work out with my current supervisor, I was not transferred as requested to a new supervisor.

Doc. #121-4 at 2.

Based on this complaint, the USDA accepted and referred for investigation the allegations that Lipovsky was subjected to retaliatory discrimination when: (1) he received a late performance evaluation that was not based on the input of a five-person team (as required by the October 2008 settlement); (2) on December 14, 2009, he received a written memorandum "severely" criticizing his conduct during a presentation; (3) "on an unspecified date, he was not promoted to a GS-15 Technology Transfer Coordinator for the Mid South Area;" and (4) "on an unspecified date, he was denied a transfer to a new supervisory structure when things 'did not work out' with his current supervisor." Doc. #121-5 at 1–2. The letter notifying Lipovsky of the referral of his allegations also notes:

> The Complainant also appears, based on the EEO Counselor's report and the unclear formal complaint, to allege that the Agency subjected him to discrimination on basis of reprisal when:
>
> A. on March 18 and July 2, 2009, he was rated as performing under the Fully Successful performance level in separate quarterly performance reviews.
> B. on July 10, 2009, he was "denied utilization of the services of Jason Bray for clerical support"; and
> C. on January 15, 2010, he attempted to initiate EEO counseling for the subject EEO complaint, but his request was not timely processed.

*Id*. at 3. The USDA found the first two complaints to be untimely but advised Lipovsky "that if his concerns about the processing of his EEO complaint have not been satisfactorily resolved, he may present them to the EEOC …." *Id*. at 4.

On July 26, 2011, the USDA's Office of Adjudication issued a final agency decision finding no discrimination based on Lipovsky's allegations. Doc. #121-1.

## 2. ARS-2010-00565

On June 6, 2010, Lipovsky submitted a Complaint of Employment Discrimination to the Office of Civil Rights Employment Complaints Division of the USDA. Doc. #121-2. This complaint, which was assigned the number ARS 2010 00565, alleged "Reprisal for Prior EEO Activity." *Id.* at 1. Lipovsky alleged in his complaint that he had "been subjected to harassment (non-sexual) and a hostile work environment in retaliation for prior EEO activity, specifically claiming:

> [T]he agency has failed to comply with the terms of my out of court settlement completed in October 2008. I was given a mid-year review on March 16, 2010 that was not based upon the agreed upon arrangement of being rated by a team of 5 individuals that was agreed to in the settlement of my federal court case ….
>
> In addition on November 2, 2009 I was informed that I was told that I was recused from overseeing a CRADA #58-3k95-9-1379-M and my requests for clarification of this issue have gone unanswered.

*Id.* at 2.

On October 27, 2010, the USDA's Office of Adjudication accepted and referred for investigation Lipovsky's allegation that the March 16, 2010, mid-year performance evaluation amounted to discriminatory harassment because it did not include "the input of a team of five people, which was in breach of an EEO-related settlement agreement." Doc. #121-3 at 1. However, the OA declined to investigate the CRADA recusal because Lipovsky "initiated EEO Counselor contact … well beyond the 45-day time limit for doing so." *Id.* at 3 (citing 29 C.F.R. § 1614.107(a)(2) and 29 C.F.R. § 1614.105(a)(1)-(2)).

On July 26, 2011, the USDA's Office of Adjudication issued a final agency decision finding no discrimination based on Lipovsky's allegations. Doc. #121-1.

### 3. ARS-2012-00727

On July 31, 2012, Lipovsky submitted a complaint of discrimination based on "reprisal and age," in which he alleged discrimination in the assignment of duties and in his performance evaluations. Doc. #121-7.

On September 7, 2012, the USDA accepted and referred for investigation the following allegations:

> Whether the Complainant was subjected to discrimination and harassment (nonsexual) based on age … and reprisal (prior EEO activity), when:
> 1. on or about June 11, 2012, management reassigned the Cooperative Research and Development Agreement he was negotiating to another employee;
> 2. on June 19, 2012, management denied his request to act as the Technology Transfer Coordinator for the South Atlantic Area and assigned the role to another employee; and
> 3. on various dates, and ongoing, management took additional steps to limit his ability to perform his job duties, reduce the scope of his position, and set him up for a negative performance evaluation, including when:
> > a. on May 15, June 18, June 26, and July 13, 2012, he was instructed to sign agreements longer than 5 years in violation of Federal law;
> > b. on May 9, June 26, and July 13, 2012, he was excluded from interactions with the Patent Advisor, even though such interactions are necessary for his job function and reflected his performance plan; and
> > c. on an unspecified date, his access to "ARIS," the website for Technology Transfer Coordinators, was blocked.

*Id.*

On July 23, 2013, the USDA's Office of Adjudication issued a final agency decision finding no discrimination based on Lipovsky's allegations. Doc. #122-2.

### 4. ARS-2013-00590

On May 29, 2013, Lipovsky filed an EEO complaint of discrimination alleging "reprisal." Doc. #121-8. Specifically, Lipovsky alleged "removal of authority to sign Material Transfer Agreements on April 8, 2013." *Id.* On July 12, 2013, the Department of Agriculture accepted and referred for investigation the MTA allegation. Doc. #121-10.

On March 24, 2014, the USDA's Office of Adjudication issued a final agency decision finding no discrimination based on Lipovsky's allegations.  Doc. #122-2.

### III
### Procedural History

### 1.  Commencement of Action in Central District of Illinois

On October 26, 2011, Lipovsky filed this action in the Central District of Illinois, Peoria Division.  Doc. #1.  The original complaint, brought under the anti-retaliation provision of Title VII, vaguely alleged that the Department, "by and through the managers[,] department heads[,] and supervisors … engaged in a systematic course of conduct designed to harass and retaliate against Lipovsky because of the disability law suit he previously filed, and because of subsequent employment discrimination complaints he filed, to prevent him from attaining the full status of Technology Transfer Coordinator position at the GS-15 level as was the intent of the Settlement Agreement in case 05-1304."  *Id*. at ¶ 15.

On December 19, 2011, the Department filed a motion to dismiss, arguing that the Court lacked subject matter jurisdiction over the settlement agreement and that venue in the Central District of Illinois was improper.  Doc. #4.  On April 30, 2012, United States District Judge James Shadid granted the motion to dismiss, holding that "to the extent that Lipovsky's Title VII claims arise from an alleged breach of the settlement agreement [the] Court no longer has jurisdiction over them."  Doc. #7 at 3.  Judge Shadid also held that, to the extent Lipovsky sought to pursue an independent claim of retaliation, "venue would lie in the Eastern District of Louisiana."  *Id*. at 5.

On May 18, 2012, Lipovsky filed an amended complaint in the Central District of Illinois.  Doc. #8.  The amended complaint asserted two counts:  (1) a claim for breach of contract; and (2) a claim for retaliation under Title VII.  *Id*.  On May 24, 2012, the Department

17

moved to dismiss the amended complaint. Doc. #9. In the memorandum accompanying its motion, the Department argued that the Court lacked jurisdiction over the breach of contract claim and that, as observed in Judge Shadid's order, venue was improper. Doc. #10. By text order on October 22, 2012, Judge Shadid, noting that Lipovsky had conceded the venue issue, transferred this matter to the Eastern District of Louisiana and denied the Department's motion to dismiss as moot.

## 2. Proceedings in Eastern District of Louisiana

On January 14, 2013, the Department filed a motion to dismiss Lipovsky's breach of contract claim for lack of jurisdiction. Doc. #18. In its motion, the Department argued that, pursuant to the Tucker Act, 28 U.S.C. § 1491, the Court of Federal Claims held exclusive jurisdiction over Lipovsky's breach of contract claim. Doc. #18-1 at 4–5. On February 20, 2013, following a hearing on the motion, United States Magistrate Judge Alma Chasez[12] entered a minute order granting the motion to dismiss. Doc. #32.

On October 23, 2013, Lipovsky moved to file a second amended complaint. Doc. #38. Lipovsky sought to amend the complaint to incorporate additional acts of retaliation and to "establish a separate count of unlawful workplace harassment …." *Id.* Judge Chasez denied Lipovsky's motion to amend without prejudice on December 11, 2013. Doc. #45.

On February 6, 2014, Lipovsky filed a "Motion to Suspend Discovery and to Continue the Deadlines in this Matter." Doc. #50. In the motion, Lipovsky alleged that he "elected to submit the dispute to mediation through the Alternative Dispute Resolution … process" and that he was waiting for the resolution of a third administrative investigation regarding his complaint

---

[12] On January 29, 2013, the parties consented to the jurisdiction of a United States Magistrate Judge. Doc. #23. In accordance with this consent, the matter was assigned to Judge Chasez.

number ARS-2013-00590. *Id.* Lipovsky represented that, in the event mediation was not successful, he would consolidate the allegations of ARS-2013-00590 into a single complaint and seek transfer "to an appropriate venue in the state of Mississippi." *Id.* Lipovsky's motion was granted on February 7, 2014. Doc. #52.

On March 26, 2014, Lipovsky filed an unopposed motion to re-open the case and to transfer the matter to the Northern District of Mississippi. Doc. #54. The motion was granted on March 28, 2014, and this matter subsequently transferred to the undersigned district judge. Doc. #57; Doc. #60.

### 3. Proceedings in the Northern District of Mississippi

On June 27, 2014, Lipovsky moved to file a second amended complaint.[13] Doc. #72. In his motion, Lipovsky sought to: (1) remove the breach of contract claim; (2) add additional acts of "retaliatory discrimination and harassment;" (3) "consolidate the continuing allegations of discrimination investigation by EEOC;" and (4) "establish a separate count of unlawful workplace harassment from the retaliation charges." *Id.*

On July 22, 2014, United States Magistrate Judge Jane M. Virden granted Lipovsky leave to file a second amended complaint, Doc. #83, which Lipovsky filed on July 28, 2014, Doc. #84. Lipovsky's second amended complaint, which alleged claims for retaliation and retaliatory harassment, focused almost entirely on the terms of the settlement agreement and the Department's lack of compliance with such terms. *Id.*

On September 19, 2014, the Department answered Lipovsky's second amended complaint. Doc. #86. On February 19, 2015, the Department filed a motion to dismiss or, in the

---

[13] While Lipovsky had previously moved to file a second amended complaint when this case was before Judge Chasez, Judge Chasez, as mentioned above, denied the motion to amend without prejudice before staying the case.

alternative, for summary judgment. Doc. #96. As grounds for dismissal, the Department argued that this Court lacks subject matter jurisdiction and that Lipovsky failed to state a claim upon which relief may be granted. *Id*. at ¶¶ 1–2.

On July 13, 2015, this Court entered an order granting the motion to dismiss. Doc. #117. The Court found that it lacked jurisdiction to hear a claim based on breach of the settlement agreement and that Lipovsky "failed to allege facts distinguishing a claim for unlawful discrimination from a claim for breach of [the agreement]." *Id*. at 12. The order, however, granted Lipovsky leave to file a third amended complaint. *Id*. at 12–13.

On July 27, 2015, Lipovsky filed a third amended complaint alleging claims for retaliation and "harassment" under Title VII. Doc. #119. The third amended complaint includes the same general allegations as the second amended complaint but, of relevance here, adds two new allegations. Specifically, Lipovsky alleges:

> [O]n April 27, 2015, plaintiff applied for a desk audit of his position and his current supervisor affirmed that at least since 2014 while under his supervision plaintiff has performed all the duties and assumed all the responsibilities of a full Technology Transfer Coordinator .... Defendant has failed and refused to promote plaintiff to the TTC position at the GS-15 level although plaintiff has successfully performed the duties of the position, and plaintiff has applied for open positions in the Mid-South Area in Athens Georgia.

Doc. #119 at ¶¶ 19, 21. In support of these allegations, Lipovsky attached a May 1, 2015, Accretion of Duties Promotion Certification, Doc. #119-4; an April 2013 vacancy announcement for a Technology Transfer Coordinator in Athens, Georgia, Doc. #119-5; and an April 23, 2013, e-mail from him seeking the Athens position, *id*.

The Department filed the instant motion to dismiss on September 10, 2015. Doc. #121. Lipovsky responded in opposition and the Department timely replied. Doc. #126; Doc. #128.

On April 26, 2016, Lipovsky filed a "Notice to the Court," asserting:

as of April 3, 2016, plaintiff was promoted to the position of Scientific Transfer Coordinator at the GS-15 level. The pay step within the GS-15 grade is yet to be determined. Please be further advised that the duties which plaintiff has alleged were removed from him because of his status as an Associate Technology Transfer Coordinator at the GS-14 pay grade were restored as of April 3, 2016, as a result of his promotion. Therefore, as of April 3, 2016, the issue of his promotion to a full Scientific Transfer Coordinator position, and the restoration of the duties removed from him because of retaliation, are now moot.

Doc. #130.

# IV
## Jurisdiction

The third amended complaint alleges claims for "retaliation" and "harassment" based

largely on the following allegations:

17. Since 2009 plaintiff had filed four (4) charges of retaliatory discrimination with the EEOC alleging, among other items, that defendant discriminated against him because of his past protected activity by:

- Failing to provide him with a timely performance review for the year 2009;
- Preparing a midyear review for the year 2010 that was negative notwithstanding the fact that (a) he received no complaints from the scientist/customers for whom he performed technology transfer duties, and (b) he received no formal counseling regarding alleged job deficiencies prior to the midyear review.
- While his annual review for the 2009 was "fully successful", he was placed on what he perceived to be a Performance Improvement Plan;
- On December 14, 2009, through discovery, he found a letter drafted by his supervisor criticizing a presentation he made on December 8, 2009, but only sent the negative document to upper management, not to plaintiff. The document did not indicate the fact that seventeen (17) out of eighteen (18) of the scientist who attended the conference rated his performance "good" to "excellent" … none rated it poor.
- On or about June 11, 2012, management reassigned the Cooperative Research and Development Agreement ("CRADA") he was negotiating to another employee allegedly because he had a conflict of interest because as a Patent Advisor, he had worked on the subject matter of the CRADA. Lipovsky did not have an economic interest in the subject matter of the CRADA, and defendant refused to explain the nature of the alleged conflict of interest.
- On June 19, 2012, management denied his request to act as the Technology Transfer Coordinator for the South Atlantic Area and assigned the role to another employee.

- On April 8, 2013, defendant removed his authority to sign Material Transfer Agreements ("MTAs") even though (a) prior to removal of the tasks he had signed over 200 MTAs for the Agency between 2009 and 2013, and (b) the authority to sign MTA's was part of his job description.
- On a specific but unknown date Thomas Moreland directed that plaintiff's name should be removed from the cover sheet of CRADAs because, in his opinion, it was illegal to allow his name to appear on the cover sheet.
- On various dates, and ongoing, management took additional steps to limit his ability to perform his job duties, reduce the scope of his position, and set him up for a negative performance evaluation, including when:
  - o On May 15, June 18, June 26 and July 13, 2012, he was instructed to sign agreements longer than five (5) years in violation of Federal law; and
  - o On May 9, June 26, and July 13, 2012, he was excluded from interactions with the Patent Advisor, even though such interactions are necessary for his job performance and reflected in his Performance Plan.

18. Lipovsky alleges that the aforementioned acts and others were part of a scheme to deprive him of the right to be promoted to full Technology Transfer Coordinator at the GS-15 pay level, in retaliation for engaging the protected activity of filing EEOC complaints based on retaliation.

19. Since his assignment as Associate Technology Transfer Coordinator plaintiff has consistently performed all the duties and responsibilities performed by other TTCs in the Agency. Moreover, on April 27, 2015, plaintiff applied for a desk audit of his position and his current supervisor affirmed that at least since 2014 while under his supervision plaintiff has performed all the duties and assumed all the responsibilities of a full Technology Transfer Coordinator.

20. Lipovsky is currently functioning as a Technology Transfer Coordinator, and has previously applied for open positions within the Agency.

21. Defendant has failed and refused to promote plaintiff to the TTC position at the GS-15 level although plaintiff has successfully performed the duties of the position, and plaintiff has applied for open positions in the Mid-South Area in Athens Georgia.

Doc. #119 at 4–6.

The Department's motion argues that the Court lacks jurisdiction to consider the third

amended complaint's allegations related to Lipovsky's request for a desk audit and his April 23,

2015, application for promotion because Lipovsky failed to exhaust his administrative remedies

as to these allegations. Doc. #122 at 10–12. In its reply, the Department once again asserts that

"[t]he dispute is one of contract to which this Court has previously determined a lack of subject matter jurisdiction." Doc. #129 at 4.

First, failure to exhaust under Title VII is not a jurisdictional prerequisite. *Flagg v. Stryker Corp.*, 819 F.3d 132, 142 n.3 (5th Cir. 2016) (Haynes, J., concurring in part). Accordingly, any failure to exhaust by Lipovsky does not deprive this Court of jurisdiction.

Next, regarding Tucker Act jurisdiction,

> The Tucker Act, 28 U.S.C. §§ 1346(a)(2) & 1491(a), vests concurrent jurisdiction in the Claims Court and the federal district court over any "claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2). If the claim exceeds $10,000, the Tucker Act grants exclusive jurisdiction to the Claims Court. 28 U.S.C. § 1491(a)(1).

*Amoco Prod. Co. v. Hodel*, 815 F.2d 352, 358 (5th Cir. 1987). Under the Tucker Act, a district court lacks jurisdiction over a Title VII claim against a United States agency when the claim is for more than $10,000 and "the primary thrust of [the] complaint is breach of contract …." *Rochon v. Gonzales*, 438 F.3d 1211, 1214–15 (D.C. Cir. 2006). To determine the "primary thrust" of a claim, a court may consider the allegations of the complaint and arguments made in support of the claims. *See Lawrence v. Lew*, 156 F.Supp.3d 149, 168 (D.D.C. 2016) (considering allegations of complaint and plaintiff's response in opposition to motion for summary judgment). Where a court lacks jurisdiction due to the Tucker Act, it may either dismiss the action or, pursuant to 28 U.S.C. § 1631, transfer the relevant claims to the United States Court of Federal Claims. *See, e.g.*, *U.S. Marine, Inc. v. United States*, 478 F. App'x 106, 108 (5th Cir. 2012) ("[B]ecause it lacked jurisdiction to hear either claim, we vacate the orders of the district court and remand with instructions that the case be transferred to the Court of Federal Claims pursuant to 28 U.S.C. § 1631."); *Bang Shun Lin v. Napolitano*, No. 12-cv-5951, 2013 WL 866506, at *1

(E.D.N.Y. Mar. 8, 2013) ("Judges in this district regularly transfer claims brought under the Tucker Act to the Court of Federal Claims.") (collecting cases).

## A.  Applicability of Tucker Act

There is no dispute that Lipovsky seeks more than $10,000 for his various claims. Accordingly, this Court lacks jurisdiction over any claims with a "primary thrust" of breach of contract. *Rochon*, 438 F.3d at 1214–15.

In drafting his third amended complaint, Lipovsky, for the most part,[14] avoids direct references to the settlement agreement.  However, Lipovsky's response[15] to the Department's motion reveals that his claims based on the failure to perform an audit, failure to convene a five-person review committee, and failure to promote, are all based in contract.

In Lipovsky's response brief, the allegations related to the Department's failure to perform an audit of his work duties and convene a performance committee are directly tied to the content of the settlement agreement.[16]  As Lipovsky correctly argues, the source of these duties is the 2008 settlement agreement between him and the Department.  Thus, in order to find the Department wrongfully deprived Lipovsky of a timely audit or a five-person performance review committee, the Court would be required to find that the Department was required by the

---

[14] In pleading his harassment claim, Lipovsky alleges that he "has been at a reduced salary since failure to promote him to GS-15 position as agreed to in the; [sic]."  Doc. #119 at 8.

[15] Throughout this litigation, Lipovsky's counsel has submitted lengthy memorandum briefs which read more as free-form thoughts than persuasive legal documents.  Beyond boiler plate standards, the briefs contain virtually no legal authority and are, for the most part, devoid of cogent analytical structures.

[16] *See* Doc. #127 at 9 ("The parties also agreed to implement a performance evaluation system based upon the equal input of five (5) individuals for whom Lipovsky had previously performed TTC services, but said system was never implemented."); *id*. ("Lipovsky's performance and position was to be audited by the defendant's Agency, but contrary to their agreement defendant failed and refused to complete an audit."); *id*. at 18–19 ("One key element not in dispute is that Lipovsky was supposed to be rated within a one (1) year period after he began his assignment in New Orleans. Lipovsky had an expectation that he would be elevated to the full TTC position at a GS-15 level. Part of the dispute is over how he was to be evaluated. Lipovsky believed that a five (5) member committee was to be formed that would evaluate his performance and give him a rating with a recommendation to be promoted.").

settlement agreement to provide Lipovsky with an audit and a five-person review committee, and that the Department breached this agreement. Because the Court finds the claims based on the failure to perform an audit and the failure to convene a review committee would necessarily require proof that the Department breached the settlement agreement, such claims fall outside this Court's jurisdiction.

With regard to the claims based on failure to promote, Lipovsky alleges in the third amended complaint that the Department "deprived him of the right to be promoted to full Technology Transfer Coordinator at the GS-15 pay level, in retaliation for engaging in the protected activity of filing EEOC complaints based on retaliation." Doc. #119 at 6. Although the third amended complaint does not specifically allege the source of this entitlement, Lipovsky's response makes clear that he bases his promotion claims on the Department's obligations pursuant to the settlement agreement. Specifically, in the opening paragraphs of his response, Lipovsky states:

> [T]he settlement provided, in pertinent part, that Mr. Lipovsky would be temporarily assigned to a[n ATTC position] for approximately one (1) year, with the understanding that after approximately one (1) year he would resume his duties as a full TTC at the appropriate pay level. Lipovsky was not promoted to full TTC and, consequently, he has charged that although he is performing all the duties of that position defendant has failed and refused to remove the "Associate" description and promote him to full TTC in retaliation for his having filed and settled the previous lawsuit, and EEOC charges filed subsequently.

Doc. #127 at 1–2. Lipovsky's reliance on the settlement agreement as the source of his entitlement to a promotion is repeated throughout his response brief.[17] Thus, as argued,

---

[17] *See* Doc. #127 at 13–14 ("A reasonable jury could conclude that defendant made a promise to Joe Lipovsky when he settled his previous lawsuit for discrimination based on a handicap condition, that they have required him to perform the work of a TTC, in retaliation that he has filed subsequent EEO charges alleging that they have modified aspects of his job duties to prevent him from being upgraded to the full TTC position, and they are refusing to honor their commitment to him in retaliation for the aforementioned event."); *id*. at 24 ("[I]t is particularly telling that management has not offered a legitimate reason for denying Lipovsky the promised promotion and pay increase.").

Lipovsky's failure to promote claim would require that he first prove the Department had an obligation under the settlement agreement to promote him to a TTC position and that it breached this agreement. As such, Lipovsky's failure to promote claims also fall outside this Court's jurisdiction.[18]

Upon review of Lipovsky's remaining claims, the Court concludes that the conduct complained of, while related to the settlement agreement, does not *require* that Lipovsky prove the Department breached the settlement agreement. The Court therefore may consider such claims, and does so below.

### B. Dismissal or Transfer

Having found that the Court lacks jurisdiction over three of Lipovsky's claims, it must next decide whether to dismiss those claims or transfer them to the Court of Federal Claims. Pursuant to 28 U.S.C. § 1631, a court which lacks jurisdiction may "transfer such action ... to any other such court" if doing so would be "in the interest of justice." A transfer will be in the interest of justice if a new action would be time barred and if the plaintiff did not bring the original action in bad faith. *See USPPS, Ltd. v. Avery Dennison Corp.*, 647 F.3d 274, 277 (5th Cir. 2011).

Here, a new cause of action for breach of contract based on the settlement agreement would likely be untimely. *See* 28 U.S.C. § 2415(a) (six-year statute of limitations for contract claims against the United States). Furthermore, there is no indication that this action was filed in bad faith. Accordingly, in the interest of justice, the Court will transfer the breach of contract claims to the Court of Federal Claims.[19]

---

[18] To the extent the failure to promote claim includes a separate pay claim, such claim fails for the same reason.

[19] To the extent this conclusion is inconsistent with Judge Shadid's original order dismissing Lipovsky's breach of contract claims, Judge Shadid's order is modified accordingly. *See* Fed. R. Civ. P. 54(b) ("[A]ny order or other

## V
## Retaliation Claims

As explained above, Lipovsky brings claims for retaliation and retaliatory harassment. The Department argues that Lipovsky may not bring a claim for retaliation based on the denial of promotion to the Athens position and, more generally, that Lipovsky's retaliation claims fail on the merits.

### A. Exhaustion

While not jurisdictional, it is beyond dispute that "[e]mployment discrimination plaintiffs must exhaust administrative remedies before pursuing claims in federal court." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378–79 (5th Cir. 2002). The "failure to exhaust administrative remedies in a Title VII case is an affirmative defense and the defendant bears the burden of pleading and proving that the plaintiff has failed to exhaust administrative remedies." *Enguita v. Neoplan USA Corp.*, 390 F.Supp.2d 616, 623 (S.D. Tex. 2005) (internal alterations omitted) (quoting *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997)); *Montgomery v. Omnisec Intern. Sec. Servs., Inc.*, 961 F.Supp.2d 178, 181 (D.D.C. 2013) ("It is the defendant's burden to prove by a preponderance of the evidence that the plaintiff failed to exhaust administrative remedies.").

The Department argues Lipovsky failed to exhaust his claims based on failure to promote and related desk audit and that, therefore, the Court may not consider such claims.[20] Doc. #122 at 10. Specifically, the Department argues that the latest date of claimed discrimination was the

---

decision ... that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.").

[20] In its reply, the Department also argues that Lipovsky failed to exhaust his claim regarding "[t]he issue of signatures" on the CRADA. Doc. #129 at 7. New arguments may not, however, be raised in a reply brief. *See Konnethu v. Harris Cty. Hosp. Dist.*, 669 F.Supp.2d 781, n.3 (S.D. Tex. 2009) ("[E]xhaustion of administrative remedies in a Title VII case is not a jurisdictional perquisite but a requirement that is subject to waiver, estoppel, and equitable tolling.") (citing *Womble v. Bhangu*, 864 F.2d 1212, 1213 (5th Cir. 1989)).

April 8, 2013, removal of authority to sign MTAs, and that "[a] person cannot reasonably expect a concluded investigation to include an event that has not yet occurred." Doc. #122 at 11–12 (quoting *Sapp v. Potter*, 413 F. App'x 750, 752 (5th Cir. 2011)). With regard to the audit, Lipovsky contends that "throughout the history of this case, defendant has asserted that Lipovsky was not qualified to do the work of a full TTC, and [the audit] was submitted simply to rebut the assertion." Doc. #127 at 15. With regard to the April 2013 job posting and application, Lipovsky asserts that the documents should be considered "to rebut the claim of defendant that since 2009 there was no TTC GS-15 positions open in the system; and ... to show that plaintiff had, in fact, applied for the job on or before April 2, 2013." *Id*. at 16.

To the extent the audit is presented as proof of qualification for promotion and not as a separate claim, there is no exhaustion issue. As for the April 2013 failure to promote, the Court has already concluded that it lacks jurisdiction over the failure to promote claims. Accordingly, an exhaustion determination is unnecessary.

## B. Merits of Discrete Retaliation Claims

"Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., prohibits discrimination on the basis of race, color, religion, sex, or national origin in federal and private employment." *Fitzgerald v. Sec'y, U.S. Dep't of Veteran Affairs*, 121 F.3d 203, 206 (5th Cir. 1997). The law also prohibits retaliation against any employee or applicant for employment because such person "opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). In bringing a Title VII action, a plaintiff "can prove discrimination through direct or circumstantial evidence." *Davis v. Miss. Transp. Comm'n*, 618 F.Supp.2d 559, 561 (S.D. Miss. 2009) (citing

*Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)). Because here, Lipovsky does not rely on direct evidence to provide retaliatory intent,[21] the Court will proceed under the circumstantial evidence framework.

When circumstantial evidence is used to support a Title VII claim for retaliation, a court will generally apply the well-known *McDonnell-Douglas* burden-shifting framework. *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001). Under *McDonnell-Douglas*, a plaintiff first must establish a prime facie case of retaliation. *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir. 2008). "If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate … non-retaliatory reason for its employment action. If the employer meets this burden of production, the plaintiff then bears the burden of proving that the employer's reason is a pretext for the actual retaliatory reason." *Id.* (internal citations omitted).

### 1. Prima Facie

"To establish a prima facie case of retaliation, [a plaintiff] must show that: (1) [he] participated in an activity protected by Title VII; (2) [his] employer took an adverse employment action against [him]; and (3) a causal connection exists between the protected activity and the materially adverse action." *Aryain*, 534 F.3d at 484. The Department argues that Lipovsky cannot satisfy the second and third prima facie requirements. Doc. #122 at 13–17.

### a. Adverse employment action

"[A] retaliation claim may rest on an action that 'a reasonable employee would have found … [to be] materially adverse, which in this context means it well might have dissuaded a

---

[21] "Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005).

reasonable worker from making or supporting a charge of discrimination." *Aryain*, 534 F.3d at

484 (quoting *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The

Department argues that "Lipovsky complains of mundane daily decisions concerning ordinary

work assignments to which he subjectively found not to be his pleasure." Doc. #122 at 16. In

his response, Lipovsky states that:

> he suffered and continues to suffer, an adverse job action in that there has been an
> ongoing dispute between him and USDA over the removal of the "Associate" tag
> on his job description (TTC) and paying him for the work he actually performs. It
> is undisputed that historically he has fully performed all of the functions of the
> TTC position, that he was a fully functioning TTC (without the title and pay) to
> the benefit of the government. It is also true that over a period of time Griesbach
> and Moreland have attempted to distinguish him from other TTCs by eliminating
> certain aspects of his duties (CRADAS and MTAs), made it more difficult for him
> to complete his work (blocked out of the "ARIS" website); attempted to force him
> to draft MTAs and CRADAs in a manner that would be in violation of federal
> statute, and alleged that he offered patent advice to a scientist which is outside the
> scope of his duties.

Doc. #127 at 27–28. Lipovsky also seems to complain of the substance, form, and timing of

various performance reviews. *Id*. at 19–20. When framed in this fashion, Lipovsky identifies

seven potentially adverse acts: (1) the failure to promote to a TTC position; (2) the removal of

his name from CRADA coversheets; (3) the removal of his authority to sign MTAs; (4) the

"blocking" of his access to ARIS; (5) the attempt "to force him to draft MTAs and CRADAs in a

manner that would be in violation of federal statute;" (6) the allegation that Lipovsky "offered

patent advice to scientists ... outside the scope of his duties;" and (7) alleged deficiencies in the

performance review process.[22] *Id*. at 19–20, 27–28.

---

[22] To the extent the third amended complaint may be read to include additional allegations, the failure to raise such claims in response to the Department's motion operates as a waiver of such claims. *See Davenport v. Hansaworld USA, Inc.*, No. 2:12-cv-233, 2015 WL 3885425, at *7 (S.D. Miss. June 24, 2015) ("The Court finds that Davenport has abandoned or conceded these claims by failing to attempt to show a genuine issue for trial.") (collecting cases).

### i. *Failure to promote*

As explained above, this Court lacks jurisdiction over Lipovsky's failure to promote claim.[23]

### ii. *MTA and CRADA duties*

Lipovsky argues that the Department wrongfully removed his ability to sign MTAs and include his name on the CRADA cover sheets. He contends that the changes in MTA and CRADA duties, "while seeming to be insignificant, [was] really an attempt to distinguish the work he performs ... from the other five (5) TTCs in the system. That ministerial task does not alter the fact that substantively he performs work equal to that performed by the other TTCs in the system." Doc. #127 at 13. Lipovsky also argues that the removal of these duties effectively deprived him of credit for work he performed. *Id*. at 22.

Under *Burlington Northern*, a change in job duties may be considered adverse. *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009). "[W]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id*. To this end, a court should consider whether the reassignment affected the plaintiff's "job title, grade, hours, salary, or benefits [or resulted in] a diminution in prestige or change in standing among ... co-workers." *Id*. Also, declining to give credit for work performed satisfies the adversity requirement for a retaliation claim when the

---

[23] To the extent the 2012 failure to appoint Lipovsky to Acting TTC of the South Atlantic Area may be read as a claim independent of a failure to promote, such a claim must fail because the undisputed evidence shows that the position of South Atlantic TTC was canceled following Nordlund's retirement with the duties (but not the title) transferred to Valco, and Lipovsky has offered no evidence that this legitimate nondiscriminatory reason is pretext for discrimination. *See Bowers v. Shinseki*, No. H-08-3445, 2009 WL 1660473, at *2 (S.D. Tex. June 15, 2009) ("Non-selection for a position that remains unfilled cannot support a retaliation claim because the cancellation of an opening is a legitimate, non-discriminatory and non-retaliatory reason for not selecting Plaintiff for those positions.").

absence of credit impacts an employee's performance review. *See Stone v. La. Dep't of Revenue*, 590 F. App'x 332, 341 (5th Cir. 2014) (adverse action where supervisor declined to give credit for work, resulting in lower "year-end production number"); *Wells v. Gen. Dynamics Info. Tech. Inc.*, 571 F. App'x 732, 736–37 (11th Cir. 2014) (without "specifics," failure to credit work not adverse).

Lipovsky has offered no evidence that the changes in MTA and CRADA duties impacted his job title, grade, hours, salary or benefits, or resulted in a diminution in prestige or change in standing among co-workers. While he speculates the changes were an *attempt* to "distinguish" his work from the TTCs, he offers no evidence that the changes had any actual impact on his work. Indeed, Lipovsky has pointed to no evidence which would show that the removal of duties impacted him in any way. Under these circumstances, the Court must conclude that the changes in MTA and CRADA duties were not adverse.

### iii. Access to system

As explained above, on an unspecified date, Lipovsky was denied access to the components of the OTT page on the ARIS system.[24] As also explained, it is undisputed that access to the OTT page is "essential" for a TTC and that lack of access could have precluded Lipovsky from doing part of his job.

The denial of access to a work computer system may rise to the level of an adverse action when "it is at least arguable" that the denial of access "materially affected [the plaintiff's] employment by making it more difficult for him to complete his work." *Gelin v. Geithner*, No. 06-cv-10176, 2009 WL 804144, at *14 (S.D.N.Y. Mar. 26, 2009); *see Terry v. Young Harris*

---

[24] Lipovsky argues in his response, that he was "out of the system for a couple of months," Doc. #127 at 29, but cites no evidence for this proposition.

*Coll.*, 106 F.Supp.3d 1280, 1301 (N.D. Ga. 2015) (no adversity for denial of access to computer system where no prejudice).

There is simply no evidence in this case that the actual denial of access to the OTT component had any impact on Lipovsky's ability to complete his work. Lipovsky has not identified which components were blocked and how, if at all, such blocks impacted his work. Indeed, the record reveals that Lipovsky, who did not inform anyone of the specifics of the incident or pursue a remedy to the alleged issue, viewed the problem as a minor one. Under these circumstances, the claim based on access to the OTT component must fail.[25]

### iv. Request to sign "illegal" documents

Lipovsky argues that Griesbach and Moreland asked him to sign "illegal" CRADAs and that "[a] reasonable jury could conclude their motive was to set him up for discipline and to harass and retaliate him [sic] for engaging in protected activity." Doc. #127 at 29–30. However, "improper work requests ... do not constitute actionable adverse employment actions as discrimination or retaliation." *King v. Louisiana*, 294 F. App'x 77, 85 (5th Cir. 2008).

### v. Reprimand for interaction with patent advisors

Lipovsky argues he was falsely accused of wrongfully giving patent advice to scientists.

While a reprimand can serve as the basis for a retaliation claim under certain circumstances, *see Willis v. Cleco Corp.*, 749 F.3d 314, 318 (5th Cir.2014) (finding that a reprimand supported a retaliation claim where the supervisor previously stated he would find a way to fire plaintiff), we have held that a written reprimand, without evidence of consequences, does not constitute an adverse employment action. *See Hernandez v. Johnson*, 514 Fed.Appx. 492, 499 (5th

---

[25] Even if the denial of access to the system could be deemed adverse, the claim must still fail because there is absolutely no evidence linking the undated action to anyone with knowledge of Lipovsky's protected activity or which establishes a temporal nexus to the denial of access and a protected action. *See Everett v. Ctr. Miss., Inc. Head Start Program*, 444 F. App'x 38, 47 (5th Cir. 2011) ("Because there is no evidence in the record that those responsible for the adverse employment actions against Everett were aware of her protected activity, Everett cannot demonstrate the required prima facie causal link.").

Cir.2013); *DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 Fed.Appx. 437, 442 (5th Cir.2007).

*Thibodeaux–Woody v. Houston Cmty. Coll.*, 593 F. App'x. 280, 286 (5th Cir. 2014). Lipovsky has offered no proof that the reprimand regarding the patent advisors produced any consequences. Accordingly, the action may not be deemed adverse.[26]

### *vi. Performance reviews*

Lipovsky argues that various supervisors gave him untimely and lower performance ratings than he deserved.[27] However, "[n]egative performance evaluations, standing alone, cannot constitute an adverse employment action." *Thompson v. Exxon Mobil Corp.*, 344 F.Supp.2d 971, 981 (E.D. Tex. 2004) (collecting cases). Likewise, a delay in performing a performance evaluation is not adverse under the Title VII retaliation standard. *Wheat v. Fl. Parish Juvenile Justice Comm'n*, 811 F.3d 702, 708–09 (5th Cir. 2016). Accordingly, the negative evaluations of Lipovsky do not qualify as adverse actions for the purpose of establishing a prima facie case.

### 2. Remaining *McDonnell-Douglas* steps

Having found that none of the complained of actions (over which this Court has jurisdiction) are adverse, the Court declines to engage in the remaining steps of the *McDonnell-Douglas* inquiry.

---

[26] In his third amended complaint, Lipovsky alleges that he was improperly excluded from interactions with a scientist. The Court notes that the evidence does not support such a claim. Lipovsky conceded that he was not excluded. Doc. #126-14 at Ex. 7 at 155. At most, the evidence shows that a scientist or patent advisor was given a "suggestion" to avoid contact with Lipovsky. There is no evidence this suggestion undermined Lipovsky's ability to work or adversely impacted him in any way.

[27] Lipovsky also contends that the form of the review, which did not include a five-person committee, was retaliatory. However, as explained above, this Court lacks jurisdiction over such a claim.

## C. Retaliatory Hostile Work Environment

Lipovsky asserts a retaliatory "Harassment Claim" based on the same conduct as his retaliation claim. *See* Doc. #119 at ¶¶ 30–31.

The Fifth Circuit "has yet to determine whether a Title VII retaliation claim based on a hostile work environment is cognizable." *Tejada v. Travis Assn's for the Blind*, 617 F. App'x 325, 328 (5th Cir. 2015). However, various district courts in this circuit, relying on out of circuit authority, have assumed that such a claim exists. *Rowe v. Jewell*, 88 F.Supp.3d 647, 673–74 (E.D. La. 2015) (collecting cases). Courts which have recognized the claim "appear to have applied the same substantive hostile work environment standard (sufficiently severe or pervasive to alter the conditions of the victim's employment) to retaliatory hostile work environments as well." *Bergbauer v. Mabus*, 934 F.Supp.2d 55, 81 (D.D.C. 2013) (internal quotation marks omitted).

In order to state a claim for retaliatory hostile work environment, a plaintiff must show: (1) he engaged in protected activity; (2) he was a victim of harassment; (3) there was a causal connection between the harassment and the protected activity; (4) the harassment was sufficiently serve or pervasive to have affected a "term, condition or privilege" of his employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action or the harassment was committed by a supervisor with immediate or successively higher authority. *Jewell*, 88 F.Supp.3d at 673–74.

> For harassment to be sufficiently severe or pervasive to alter the conditions of the victim's employment, the conduct complained of must be both objectively and subjectively offensive. Thus, not only must the victim perceive the environment as hostile, the conduct must also be such that a reasonable person would find it to be hostile or abusive. To determine whether the victim's work environment was objectively offensive, courts consider the totality of the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4)

whether it interferes with an employee's work performance. No single factor is determinative. In short, a showing that the employee's job performance suffered is simply a factor to be considered, not a prerequisite.

*Equal Emp't Opportunity Comm'n v. WC & M Enters., Inc.*, 496 F.3d 393, 399–400 (5th Cir. 2007) (citations omitted). "[C]ourts have been hesitant to find a claim for hostile work environment when a complaint contains no allegations of ... retaliatory, ridicule, or insult in the plaintiff's day-to-day work environment and relies instead on incidents of allegedly discriminatory non-promotions and other performance based actions." *Outlaw v. Johnson*, 49. F.Supp.3d 88, 91 (D.D.C. 2014).

The Department argues that Lipovsky "cannot show that he suffered from actionable harassment by frequency, severity or interference with his work performance. Further, Lipovsky cannot show a term or condition of privilege of his employment has been affected[.]" Doc. #122 at 19.

First, Lipovsky complains of a series of discrete acts, set forth above, which occurred over a period of approximately four years. "In general, sporadic or isolated workplace interactions are not actionable ultimate employment decisions, as required for a ... hostile work environment claim." *Memon v. Deloitte Consulting, LLP*, 779 F.Supp.2d 619, 636 (S.D. Tex. 2011) (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007)).

Additionally, the conduct complained of (failure to promote, unfair and delayed evaluations, denial of access to a computer system for an unknown duration, an unfair reprimand, removal of "ministerial" duties, and an improper work request)[28] was neither severe, physically threatening or humiliating. *See Minnis v. Bd. of Supervisors of La. State Univ. and Agr. Mech. Coll.*, 620 F. App'x 215, 221 (reprimands and evaluations not severe or pervasive);

---

[28] Out of an abundance of caution, the Court has considered Lipovsky's contract-based allegations in the analysis.

*Herm v. Union Carbide Corp.*, No. 4:08-cv-2272, 2009 WL 7326067, at *4 (S.D. Tex. Sep. 1, 2009) ("Viewing the facts in the light most favorable to Plaintiff, LaBean's actions—disciplining Plaintiff following the chair incident and the logbook incident, requiring Plaintiff to complete a Performance Improvement Plan, and giving Plaintiff a negative evaluation in 2007–do not approach the 'severe and pervasive' harassment required to support a hostile work environment claim."); *Laughlin v. Holder*, 923 F.Supp.2d 204, 221 (D.D.C. 2013) ("[D]espite Laughlin's claim that serving as SAC of the same division for more than seven years while nearly all of one's peers are promoted can be 'objectively and subjectively humiliating,' the Court simply does not find that the non-promotions and other performance-based actions alleged rise to the level of an actionable hostile work environment.").

Finally, as discussed at length above, there is no evidence any of the allegedly wrongful conduct actually interfered with Lipovsky's job performance. Under these circumstances, the Court concludes that Lipovsky's retaliatory hostile work environment claim must fail.

## VI
## Conclusion

For the reasons above, the Department's motion [121] is **GRANTED in Part and DENIED in Part**. The motion is DENIED to the extent it seeks dismissal of Lipovsky's claims based on failure to promote, failure to audit Lipovsky's position, and failure to convene a five person review committee; and such claims are **TRANSFERRED** to the United States Court of Federal Claims. The motion is GRANTED to the extent is seeks summary judgment on Lipovsky's remaining retaliation claims.

**SO ORDERED**, this 14th day of September, 2016.

/s/ Debra M. Brown
**UNITED STATES DISTRICT JUDGE**